Casey, C. J.,
delivered the opinion of the court:
In the autumn of 1862 the United States military authorities determined to send an expedition south, by water, under command of Major General Banks, since known as the “ Banks expedition.” To make it effective it was desirable to keep the character and destination of the expedition a profound secret. A large number of seagoing vessels were necessary to carry the men, their equipments, and supplies. To obtain these in due season, of proper kind, and at reasonable rates, the Secretary of War, Mr. Stanton, applied to Cornelius Vanderbilt, esq., of New York city, a gentleman of large wealth, of long and practical experience as a navigator and ship-owner, to accept some official position by which he could make his knowledge and experience available to 'the government in fitting out and sending forth the expedition. Mr. Vanderbilt positively and peremptorily declined any official appointment, but tendered his services in any way they could be made useful as an individual gratuitously to the United States. They were accepted, and it is said were of great value to the United States in procuring in a short time, and at fair rates, a superior class of transports.
*489 To assist Mr. Yanderbilt in these duties Commodore Yan Brunt, of the navy, was detailed, and Mr. Charles H. Haswell, an eminent naval engineer and surveyor for the underwriters of New York city, was employed, as inspectors of vessels, machinery, &e.
In November, 1862, the claimant, being the owner of the steamer Niagara, offered her to Mr. Yanderbilt. The latter directed her to be fully inspected by Commodore Van Brunt and Mr. Haswell. Their report being favorable, the vessel was chartered for the expedition. She was to be paid the same compensation as the New Brunswick, in proportion to the tonnage of the respective vessels, which at that time had not been ascertained.
The Niagara was a side-wheel steamer, built for lake navigation with projecting guards. She had been running for some time as a passenger boat between New York city and Sag Harbor, on Long Island sound. To fit her for coast service she was sponsoned. Certain other improvements and additions in her pumps and securities against fire, suggested by Mr. Haswell, were made, and she was turned over to the United States on the 27th November, 1862.
She was placed in the dock at New York city, and took in about one hundred and fifty tons of coal. A large amount of quartermaster’s stores were put on board, and about four hundred and forty men of the 50th regiment Massachusetts volunteer infantry. She left New York on the 14th or 15th of December. During her first night out the sponson on one side of the vessel filled with water, which caused her to become logy and run badly. Being low in the water, it was found that her blow-pipe discharged more than a foot below the surface. The pressure upon it from the resistance caused it to burst. The officers and troops on board became alarmed, and, being then off the Delaware breakwater, compelled the captain and officers of the ship to run her into Philadelphia.
When informed of the vessel being at Philadelphia, Mr. Yanderbilt ordered her back to New York. In the mean time, however, orders had been received from the War Department to have her detained at Philadelphia. In January following the claimant made application to the Secretary of War to have her discharged. He was referred to the Quartermaster General, who refused the application. Similar applications made afterwards were also denied. She was detained at Philadelphia until some day in March, when she was ordered back to New York city, and delivered over to the claimant on the 12th of that month, having been in possession of the government for one hundred and six (106) days. The claimant, in this suit, seeks to recover the *490 agreed compensation for that time. The recovery is resisted by the United States on account of the unseaworthiness of the vessel and her unsuitableness for the service in which she was to be employed. .
The claimant contends — •
1st. That for ordinary coast service or inland navigation the vessel was in every respect seaworthy and suitable.
2d. That he made no representation or gave no warranty of her seaworthiness or suitableness for the voyage, not having been informed of her destination or the kind of service required.
3d. That the vessel was hired on the inspection and examination of the agents and officers of the United States, and not upon any representations or agreement made by the claimant.
4th. That the breaking up and interruption of her voyage occurred from the excessive overloading of the vessel by the officers and agents of the United States, without the fault and against the remonstrance of the claimant.
The testimony is somewhat voluminous, and, in some respects, contradictory. We have examined it with more than usual care, for the reason that the matters relating to the hiring of this vessel and others for the same expedition were the subject of an examination before and a report by a committee of the Senate of the United States in 1863.
No written charter was made when the vessel was hired. One was afterwards drawn up and signed on the 15th December, 1863; more than a year after the vessel had been employed. But we do not find that Vanderbilt had any authority to enter into any such stipulations at that time on behalf of the United States. His agency in the matter had been closed, and his authority in the premises exhausted. So that the written charter-party must be considered entirely out of the question here. The question therefore is, whether there was any fraud or misrepresentation on the part of the claimant in regard to the seaworthiness of the vessel, or her adaptation to the purpose of the voyage. Or whether she was hired by the United States on their own examination and inspection. On this subject Vanderbilt testifies as follows:
He was asked to state what he knew of the charter of the Niagara.
“The application for the charter of the Niagara lay there among those of the other steamers; it lay on my desk; the owner one day applied for a charter for her.
“ What was his name 1
“A. J. Kiehardson, I believe; he represented her as first-quality vessel; after he so represented her I spoke to the inspectors; but you have not got to the inspectors yet; there were inspectors appointed by the War Department, as I understood, to inspect these vessels.”
*491 After detailing other matters he says: “ These two gentlemen,” (Commodore Van Brunt and Charles H. Haswell,) “as the inspectors of these vessels. "Whenever I took a vessel I always took it subject to that inspection by these people, who should go and inspect them. If they did not bear inspection, of course the vessels were not chartered. It relieved me from some trouble. When this Niagara came, and the men reported her to me, I asked these gentlemen to go and inspect her, and see if she was what the man reported her to be, and whether she was fit for this expedition. They did go and so inspect her, and reported to me that she was.”
The parties agreed to the following stipulation:
“ It is agreed and stipulated to admit, for the purposes of the trial of this cause, that John W. Locke, who was lieutenant colonel of the 50th regiment Massachusetts volunteer infantry, and who was examined before a special committee of the United States Senate on the 27th day of December, 1862, would testify, if examined, that he was on board the steam transport Niagara at the time of the sailing of said steamer from the port of New York, on the Banks expedition, in December, 1862; that said steamer encountered fair weather for twenty-four hours after her departure from New York; and that the port sponson of said steamer sprung a leak, and she burst her blow-pipe ; and that said witness discovered one beam and some carlines, in the after cabin of said vessel, which were so far decayed as, in the opinion of said witness, to be useless; that said witness would testify that, in his opinion, said vessel was unseaworthy for the purpose of malting a voyage with troops and supplies to any port of the United States, the Gulf of Mexico, or the'West Indies.
“And it is further stipulated and admitted, on the part of the United States, that said witness Locke is not an expert in regard to the seaworthiness or unseaworthiness of vessels or steamships.
“And it is further admitted, on the part of the United States, that at the time of the chartering of said steam transport Niagara, the purposes for which she was chartered, and the ports and voyages which she would be required to make, were kept secret from the said Andrew J. Richardson, the owner of said transport, and claimant in this cause, and he had no knowledge of the same.”
Charles H. Haswell testified as follows :
“I examined the steamer Niagara, owned by Mr. Richardson, in the month of November, 1862; I made that examination by authority of General Banks, received through Commodores Vanderbilt and Van Brunt; also, in the official discharge of my duty as surveyor of steamers for the underwriters; I reported her to Commodores Van Brunt and Vanderbilt as sititable to transport troops coast-wise ; I had made a previous examination of the vessel as a surveyor of steamers, and was somewhat cognizant of her capacities and condition; I examined the condition of her hull and her machinery and her equipments, including general tackle, and her security against fire; I made some requirements for further security, which were complied with by the owner; I reported the vessel as capable *492 and sufficiently provided for the purposes for which she was required; if I had not considered her seaworthy I would not have made such a report; this was prior to her going on the Banks expedition.”
Commodore Yan Brunt testifies :
“ Question. "Were you on hoard the Niagara1?
“Answer. Repeatedly.
“ Question. What report did Mr. Haswell make as to her 1
“Answer. I have his report here. He reported her condition and seaworthiness, in hull, engines, and boiler, to be fair, and her security and provisions against fire indifferent. That appears by his written report now before me. A similar report is made in every one of these cases.
“ Question. Do you know whether Mr. Haswell examined particularly the timbers and hulls of these vessels ?
“Answer. Yes, sir. I went on board with him. I saw her on the ways, in the first place, when she was putting her sponsons on. I went over there and she was on the ways at Jersey City, and Mr. Haswell examined her. I was with 'him. Her bottom appeared fair, and was, no doubt. The sponsons on that vessel were put on tight, as was supposed, and the subsequent difficulty arose, as I suppose, from the fact that her sponsons leaked before she got to Philadelphia, and filled with water. The vessel became logy; the men got frightened, and they run into Delaware breakwater. Any man who knew anything about this subject would tell you that, if they had taken a plank off, so as to allow the water to run in and out, that difficulty would have been overcome; because these sponsons were simply to break the sea off of the guards, and if they had taken a plank out she would have been perfectly seaworthy. There was no evidence of weakness about her. I went around her, and if I had discovered any evidence of weakness I would have noticed it. I believed she would have performed her voyage.
“Question. To New Orleans 1
“Answer. Yes, sir; I believe she could; that is my opinion about it; I examined her particularly; I was on board her particularly when she sailed; I went aboard to see that she was not overloaded; there were about one hundred men then alongside, and a large amount of freight was also lying there in a lighter— barrels, &c. I said to the quartermaster, ‘ You are loading this vessel too deep; you must not put those men on board; neither must you put that material on board, because it is too large a quantity; I think she now has enough on board.’ She then had 440 men, as near as we could ascertain; at my request they were taken away from her and placed on another vessel, and she went with only those men on board her. That vessel could easily have taken 500 men if she had not been overloaded with stores; she had room for that number. The great difficulty is that they crowd all these vessels with stores from the quartermaster’s, commissary’s, and medical departments; it is one of the most difficult things to keep them in order.”
Captain J. Langdon Ward testified:
“I knew the steamer Niagara. I was on board of her in December, 1862, on the occasion of taking a part of the 50th regiment of Massachusetts volunteer militia to Philadelphia. I was a captain in the regiment.
*493 “ The vessel wrent from this city to the Delaware breakwater; I don’t know where she started for; I can’t tell why she went to the breakwater of my own knowledge. While I was on board of her I saw evidences of her nnsoundness. The first thing that I saw was some rotten wood in some beams in the lower cabin aft, which ran athwartship. I don’t remember how many; I should think about two or three. On the way down the sea was very still; there was very little wind, if any, and we ran along very slowly. The ship seemed to labor considerably. I think we left here about one o’clock Saturday afternoon, and got to the breakwater about ten o’clock next morning. Do not know the distance. She was heavily loaded ; her after-guards at the gangway were not more than three feet above the water.
“ The thing which astonished me most was that after we got to Philadelphia one of my men sent for me into the lower after-cabin, where they were, and put the small end of his ramrod against the side of the ship, put one of his fingers on the other end and pressed the ramrod right through the side of the vessel. I went up on the main deck and stooped and looked under the guard and saw the end of it sticking out. I saw no hole there.”
Another witness says :
“Answer. My name is George H. Willis; my occupation, ship-broker; my age is forty-one years; my residence the past year, Orange, New Jersey. I have no interest, direct or indirect, in the claim which is the subject of inquiry, and am in no degree related to the claimant.
“Being interrogated by the assistant solicitor for the United States, the witness says: Was in no business in December, 1862; previous to that time had been at sea in command of a vessel; had been at sea since I rras about fourteen years of age; had been in command of vessels, but not of steamers. In the early part of the war, don’t know the date, saw the steam transport Niagara in this port; don’t remember how often I saw her ; remember going on board once; I looked at her and walked through her as far as I could; she had some cargo aboard. My cousin, Captain Duncan, was going in her; that was the reason I went aboard.
“Question. State whether, from the examination you made of the vessel, you were able to come to any conclusion or not as to her seaworthiness, or whether she was a vessel adapted for navigating the ocean, being sent with troops and freight, or stores, to any port in the United States, Gulf of Mexico, or West Indies.
“Answer. As near as I can remember I expressed the opinion at that time, that I did not think she was suitable to carry troops outside. I judged from her appearance that she was not built for that purpose. Por the purpose for which I supposed she was built I should think her seaworthy. I supposed from her appearance that she was built for river and sound navigation.”
Thomas D. Taylor thinks the vessel was not suitable to be sent with troops and supplies to any port of the United States, Gulf of Mexico, or West Indies.
Mr. Haswell testifies further in reference to the inspection made by him in November, 1862:
“ Commodore Yan Brunt was associated with me in making this inspection; I visited her twice when she was upon the ways in Jersey City; that was when she *494 was being repaired by Mr. Allison; I do not recollect the exact time I was occupied in malting that examination, hut my examination was sufficiently full to render me very clear as to her condition; Commodore Yan Brunt was with me at one time when I made these examinations; I reported the result to Commodores Yanderbilt and Yan Brunt; the report was in writing; I delivered it to them, and upon it they acted; Mr. Richardson was not with me; I did not know him.”
He further swears:
“ I again inspected the vessel in March or April, soon after her return from the Banks expedition, at the request of Brigadier General Yan Vliet, quartermaster at this place, and in the discharge of my duty as surveyor of steamers : I made a report at that time to General Van Vliet, to the underwriters, and a communication to Mr. Richardson; my report to General Yan Vliet was on the eleventh of May.”
The substance of the report,was as follows :
“ This vessel is effectively sound, the exceptions to entire soundness being confined to some of the inner faces of the wales, abreast of the boiler and where they lie against the frames, and one of her clamps at a scarf where it has been exposed to weeping from a wheelhouse.
“ As a whole, the frame of this vessel is very heavy and very sound; her waterwheel guards are sponsoned forward and slatted aft, and she is suitably fitted with an independent steam, fire, and bilge-pipe, hose and ground tackle.”
Samuel Zane, an inspector at the port of Philadelphia, examined the vessel while she lay in that port. His testimony is substantially as follows :
‘ ‘ I found her in very bad condition. I visited her with my colleague, who was the boiler inspector, James W. Waples. We received instructions from the Secretary of the Treasury to visit all transports that came into this port, to see whether they complied with the inspection laws. We visited the Niagara shortly after her arrival, while lying near about opposite the navy yard, or a little above may be. We, after we had boarded her, found on her larboard side, aft the wheelhouse, that two or three deck plank had been knocked out; also on the starboard side found the deck pretty well rotten in one place. ‘ My colleague went to look after the boiler and engine, while I went in the after cabin to examine the hull of the vessel. She was pretty well loaded down with commissary stores. I called for a light and got one. I found her beam and carline, after I took the casing off, in very bad condition; so much so that I pulled a piece out two feet in length, and could have pulled it all away. This was out of one of the main beams. I examined the carlines where they rested on the clamps. All I examined were pieced out. I came upon deck and asked for the captain. I think I saw the captain. X told him he must not go to sea in that vessel in her present condition. I went to the district attorney and related the case to him. He told me to telegraph to the Secretary of War ‘ For God’s sake not to let that vessel go to sea.’ tie gave me a note to take to the captain, a protest. I went aboard and delivered it to the captain. I went aft to the quarters where the officers were quartered; I found all *495 the officers were dissatisfied with the vessel. I went around the side of her in a small boat, under her guards, to make an examination there. She was pretty-well down in the water. I found nothing there that looked different from her general appearance.”
James W. Waples, an inspector of machinery, corroborates Zane as to the condition of the beams and earlines, but sajs nothing wrong with the machinery.
Mr. Allison, a shipbuilder, testified that he repaired the vessel for Bichardson in 1862, before she was chartered to the United States, and examined her very closely. He says:
“I think, as to the hull, she was sound. As far as I examined, I found nothing that was not sound. I found some beams in her that were not sound. Some of her deck beams were started, that is, a little decayed. Where we found the beams decayed we put others alongside of them. I considered her a good staunch vessel. I think I am competent to judge of the seaworthiness and the proper construction of a vessel. At the time this vessel left my yard I considered her seaworthy in all respects.”
John Crawford, who superintended the repairs of this vessel in November, 1862, at Mr. Allison’s ship yard, swears :
“ I did everything that I thought was necessary to render her safe and seaworthy for a coast voyage; when she left the dock she was in all respects safe and seaworthy as to hull and machinery. For a vessel of her class she was uncommonly strong and heavily timbered. I think she had five keelsons; some have five, some only three.
“ I have been engaged for upwards of thirty years in building and navigating vessels, and have done nothing else.
‘ ‘ Properly loaded and commanded by a proper commander, this vessel was suitable and a proper vessel for a coastwise voyage, in my opinion. I saw this vessel after she was loaded, and before she sailed, at a distance; I was near enough to see whether she was properly loaded; she was loaded entirely too deep by eighteen inches.
‘ ‘ From the examination I made when she was on the dock, I have no hesitation in pronouncing her as sound and seaworthy as any vessel of her class and age.
“I was engaged on this vessel at the time she was inspected by Mr. Haswell and Commodore Yan Brunt; I went with them in their inspection. They examined the boat all over in every respect. They did it in the usual way, and made no objection to any repairs that were being made; I think Mr. Haswell was there twice. After we had left the dry dock, and had coaled and gone to the foot of Canal street, Commodore Yan Brunt inspected the boat. He did so carefully. I heard him express no dissatisfaction.”
She was examined at same time by Bear-Admiral Stringbam, at the instance of Quartermaster Yan Yliet, and pronounced suitable for inland navigation, but unfit for sea service.
*496 Henry R. White testified as follows :
‘ ‘ Í hare been engaged in the business of ship joiner more or less for twenty years, having a good deal to do in building and repairing vessels, more particularly steam vessels; I knew the Niaraga, belonging to the claimant, in 1862; I was engaged in the fall of 1862, in October and November, in fitting her for government service. I had at that time a good opportunity to examine her in reference to the condition of her timbers and her general soundness and strength. She was then on the dry dock at Jersey City, which gave me unusual opportunities to examine her. A plank of her garboard streak was removed on each side of her keel, for the purpose of cleaning her on the outside of the bottom and putting in new limber chains.
“ The timbers were very sound, so much so that it was almost impossible to remove the planking, and so tough that the spikes could not be drawn until the planking was split and chipped off. Her bottom and hull timbers were perfectly sound. In the deck timbers I found some partially decayed wood. These were repaired by mo. When these repairs were made I considered the vessel in a sound and seaworthy condition. She was more heavily timbered than vessels of her size and class. The timbers were principally oak. This is unusual in this class of vessels, chestnut and pine being frequently used. She had two more keelsons than is common; she had five; they were more than usual size; they were very large. Her timbers were heavier than usual, and more of them.
“After the vessel started on the Banks expedition and put into Philadelphia, I examined her as to her soundness and condition; that examination was a thorough one. I examined every timber, separately and took a note of the condition. I found her as she was before, sound and seaworthy; the only exception to soundness being one deck beam and three carlines. The defects in the deck beam and carlines would not affect her strength and seaworthiness. The carlines are only used to keep the deck in shape. I considered the vessel at the time of this examination seaworthy. At this examination I bored the deck timbers ; this was done thoroughly to ascertain whether they were sound. I bored those which were cased as well as the others. I found all but one deck beam and three carlines sound.
“ The wheel beams are the most important deck beams in a vessel, as they support the decks in the centre of the vessel. They were of white oak and of unusual size. I bored one of them, I think at the request of Mr. Zane, the inspector. I found it perfectly sound, although discolored in consequence of the action of the salt water on the iron bolts, which would discolor it, but had not decayed it. I examined the borings very carefully, and found them perfectly sound. Mr. Zane, the inspector at the time, pronounced this timber unsound, by which my attention was particularly called to it.
“ She returned from the Banks expedition in March, 1863; I examined her at that time at Sag Harbor. I made a thorough examination at that time. I had the floors taken up, and some of the ceiling taken out to examine her. I found her sound then. The decayed beam and carlines were taken out and new ones put in. I never at any of these examinations found anything to indicate unseaworthiness.”
Citarles B. Arnold, an engineer and manufacturer, swears :
“I know the steamer Niagara, formerly owned by Mr. Eichardson; I first saw the boat in the Genessee river, at .Charlotte, near Eoehester; this was about the first of June, 1862, or within a few days of it; I took charge of her and brought *497 her around to New York, down the rapids of the St. Lawrence, through the Gulf, and around to New York by sea; we had on that voyage quite a good deal of rough weather; the ship behaved well; she gave evidence of being a good sea boat, staunch and strong.”
In another part of his deposition he says :
“When she returned from the Banks expedition I examined her and found her lines — I mean her hull — as perfect as they ever were; over the defective beam and carlines the deck was level and straight and in proper shape; her machinery worked as easy and well as I have ever seen machinery work, and was in on respect thrown out of level; the fact that the lines of the vessel were straight, and her machinery plumb, and working free, was conclusive evidence that she was sound and seaworthy; after her return from the Banks expedition I took out the floors and lining of the vessel, by Mr. Richardson’s direction; I found her sound in all particulars; I went with a hammer and augur and examined her thoroughly; we bored and hammered, and made a critical examination in every particular; I have no hesitation, from that examination, in pronouncing her sound and seaworthy.”
Samuel Churchman testified:
“ On the 19th of February, 1863, I went into the employment of the government as special agent in the Quartermaster’s Department; I was employed in division No. 3, having charge of ocean and lake transportation; I think in May, 1863, Mr. Eichardson was in Washington and offered the Niagara for sale to the Quartermaster’s Department; I was present at this interview with the Quartermaster General; he offered her for a requisition we had for New Orleans ; Mr. Eichardson offered her at a very low price, and agreed to deliver her in New Orleans, he taking the risk, owing to the injury done her reputation by the report of the Senate committee. The government was to pay the expense of taking her to New Orleans, and she was to be paid for on her safe delivery there ; on this proposition the Quartermaster General consented to purchase her, on condition that l would inspect her personally and found her suitable; I did then visit and inspect the vessel; / found her to be in very excellent condition; I examined her carefully and found her as'seaworthy as any vessel of her class for coast service; I then made the agreement to purchase her; the purchase was made irrespective of any claims Mr. Eichardson might have on the charter ; the purchase was made, as far as I was concerned, because I thought her a good and cheap vessel; I think she was sold very much below her value at that time; I know officially that she performed good and valuable service for about two years after her purchase.”
John M. Weeks was United States local inspector of steamers for the district of New York in 1862 :
“I inspected the steamer Niagara, then belonging to claimant, on the 4th day of November, 1862.
“ At the time of this examination I found the vessel sound, or I would not have granted a certificate of inspection.
‘ ‘ My practice is to make a thorough examination, and where there is any material unsoundness I would discover it; I recollect having made a thorough examination of the Niagara.”
*498 Jobn Tucker testified:
“I.waa an-Assistant Secretary of War from January, 1869, to January, 1863; I knew of an application made by the claimant to the War Department for a release of the Niagara from her charter; it was in the latter part of 1862, or beginning of 1863.
‘ ‘ Mr. Richardson applied to me, then acting as Assistant Secretary of War; and I verbally communicated that request to the Quartermaster General, who at that time declined the application.
“I think Mr. Richardson spoke to me about it on another occasion; she was not to my knowledge discharged on that second application; the second application was soon after the first; I cannot remember the date of it; I know of no other application for the discharge of the Niag'ara.
“ I know that the Niagara was chartered by Commodore "Vanderbilt, by general authority given by the Secretary of War to charter-vessels for the Banks expedition.”
Wickham S. Havens testified:
“I was formerly a ship master and ship agent; from 1828 to 1844 I was constantly at sea; from 1844 to 1855 I was ship agent, a commission merchant, and, ship chandler to 1859; from 1859 to 1884' a steamboat captain; during a part of the time from 1859 to 18641 knew the Niagara, belonging to claimant; I had command of her from July 8th, 1862, until about September 14tk, 1862; a part of this time I was running her from New York to Sag Harbor, and a part of the time she was employed on the McClellan expedition, so-called, conveying troops from the Peninsula to Aquia creek and Washington and Alexandria; during this time I had good opportunities of knowing the quality of this vessel; I knew all about her; in my opinion, vessels of her class are not calculated for ocean navigation; she was better suited to rough water than any other of her class I knew of; I knew the vessel particularly at the time she was chartered' for the Banks expedition ; I considered her at that time a seaworthy vessel in the sense of being sound and having sufficient strength for the purposes of navigation; I never saw any weakness in her whatever ; there was no spring in her; she was built and had a frame like a ship; I told Mr. Grimes, of the Senate committee on Banks expedition charters, that I could go around the world in her, if her guards were reduced. I saw her on her return from the Banks expedition ; I had charge of her from the 10th of January to 12th of March, 1863, while on this expedition; I knew her to be as seaworthy then as she was before; when she returned from the Banks expedition I saw the condition she was in; I saw a beam and two or three carlines that were decayed; the decayed beam and earlines did not affect the seaworthiness of the vessel or weaken her materially; after this vessel was sold to the government, in May, 1863, I took her to New Orleans; we went around Cape Hatteras in a northeast gale; we were two days in it; I don’t think there is any worse place for a vessel on the globe; she behaved well.”
The facts of this case may be summed up as follows r In November, 18G2,, the claimant being informed that Mr. Vanderbilt was chartering, vessels for government account, offered him the Niagara, which had recently come out of the service of the United States from tha *499 “ McClellan expedition.” The vessel was then on the ways, for repair, at Mr. Allison’s ship yard. Vanderbilt directed Commodore Van Brunt and Haswell to examine and inspect this steamer, and report to him whether she was seaworthy and fit for the expedition. They made a favorable report in both these respects. They had every facility afforded them to make the examination, the vessel being out of water, and on the ways. They did so, without depending in any way upon the representations of Richardson, the owner. Upon that report Vanderbilt hired her, without, in any way, requiring any representations or warranty from the owner, either as to her seaworthiness or her suitableness for a coast transport.
He relied on the inspectors’ report alone, the owner not even being informed where she was to be sent, or in what, character of service she was to be employed. There is no evidence from which either a fraud or warranty on the part of claimant can be inferred. The steamer was carefully repaired, found, and equipped, and received by the officers and agents of the United States on the 27th November, 1862.
The witnesses on both sides, without exception, concur that the • vessel was not well calculated for sea service. She was a side-wheel steamer, with wide, projecting guárds; that she had to be sponsoned to fit her even for sound or coast service; that she was built for and adapted to inland navigation. The testimony is equally concurrent and conclusive that the vessel, when she left New York city on the Banks expedition, was greatly overloaded. Her guards, which should have been at least three feet from the water, were less than eighteen inches.
During the first night out from New York her sponsons filled with water and her blow-pipe bursted, both of which could have been easily remedied; but the soldiers on board became alarmed, and compelled the officers of the vessel to take her into the port of Philadelphia. The men were, after some two or three weeks’ delay, transferred to another vessel, the cargo taken out of the Niagara. Several applications of Richardson to have the vessel released to him were refused. She was kept with a full complement of officers and crew on board, and her fires up during the entire time, ready to go to sea at any time in an hour’s notice.
In May, 1863, she was purchased by the United States, through the Quartermaster General’s Department, for thirty thousand dollars, after a careful and thorough inspection by Mr. Haswell, Mr. Churchman, and Rear-Admiral Stringham. She was taken around to New Orleans, encountering a very severe northeast storm off Hatteras, in *500 which she was two days, behaving well, and getting to her destination without injury. Mr. Churchman says he had official information that she had rendered efficient service for two years subsequent to her purchase.
Upon this state of facts we cannot see how a recovery can be resisted. Vanderbilt had authority to hire the vessel. He did employ her at a fixed compensation. She was fit for inland or short coast service. The claimant was entirely unaware how she was to be employed or where sent. How could he be responsible that she should be suitable for that of which he had not the remotest idea she was to be employed in ? The government made their own selection and inspection, and, unless there is fraud or concealment on the part of claimant, are liable for the hire while they had the vessel in possession. There is no evidence whatever of fraud, and none can be presumed.
But why she was kept for more than one hundred days, lying idle at the Philadelphia wharf, passes all comprehension, when she ought to have been redelivered to the claimant within ten days, and her pay stopped if found to be unfit for the service for which she had been chartered. We must of course presume that there was some good reason for retaining her, especially when the claimant repeatedly applied to the War Department to deliver her up to him and was refused. Whatever it may have been it was doubtless for some public object and purpose, and requires, according to all right notions, that just compensation should be made for it. The claimant during all that time was at the expense of fuel for his vessel, her officers and crew were kept full, their hire was paid, same as if actively employed; the time of the vessel was totally lost if not paid for by the government.
The price at which the vessel was chartered must be regarded as the fair market value of such services as she was fitted to perform. No one was a better judge of that than Mr. Vanderbilt. But her full expenses lying in port, although with fires constantly kept up, were less than on active duty. The wear and tear of her machinery would be saved, her risks would be smaller, although her insurance was probably the same. For these a deduction is to be made; that deduction, in our judgment, ought to be one-third the compensation; then to the balance is to be added the cost of the repairs for the damage committed by the soldiers on the run of the vessel to Philadelphia. The proof is that those repairs cost claimant thirteen hundred and thirty-five dollars.
*501 The account will stand thus :
106 days’compensation, at*#000. #63,600 00
Deduct 33£ per centum. 21, 200 00
42,400 00
Add repairs, as above. 1, 336 00
43,735 00
We therefore find due to the claimant forty-three thousand seven hundred and thirty-five dollars, (#43,735,) for which sum judgment will be entered in his favor.
Loring, J„ dissents.